DUNN v DUNN

Docket No. 49685. Submitted December 2, 1980, at Grand Rapids.—
　　Decided April 23, 1981.

　　David Dunn was granted custody of his two minor children
　　pursuant to the provisions of a judgment of divorce from Sue E.
　　Dunn. No order of support was entered against either party.
　　Subsequently, he voluntarily relinquished custody of the chil-
　　dren because of his pending overseas assignment by a religious
　　order of which he is a member and which is his employer. Sue
　　Dunn moved for modification of the judgment of divorce to
　　provide for child support by David Dunn. Following a hearing,
　　the lower court ordered David Dunn to pay child support in
　　excess of his future estimated earnings, Kalamazoo Circuit
　　Court, Donald T. Anderson, J. He appeals, alleging that the
　　trial court erred in determining the amount of child support.
　　*Held:*

　　　The trial court erred in determining the amount of child
　　support which David Dunn was required to pay on the basis of
　　his prior earning capacity. The record reveals that David Dunn
　　acted in good faith and without a willful disregard for the
　　interests of his children in taking a voluntary reduction of
　　income by accepting an overseas assignment from his religious
　　order.

　　　Reversed and remanded.

　　　J. T. KALLMAN, J., concurred. He would hold that the order of
　　child support violated David Dunn's constitutional right of
　　freedom of religion in presenting him with no other choice than

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] 5 Am Jur 2d, Appeal and Error § 868.
　　Power of court to modify decree for support of child which was
　　　based on agreement of parties. 61 ALR3d 657.
[3] 24 Am Jur 2d, Divorce and Separation § 839.
　　Adequacy of amount of money awarded as child support. 1 ALR3d
　　　324.
[4-6] 24 Am Jur 2d, Divorce and Separation § 848.
　　Change in financial condition or needs of parents or children as
　　　ground for modification of decree for child support payments. 89
　　　ALR2d 7.

to leave his religious order and seek secular employment in order to pay the amount of support ordered. He also would reverse and remand.

OPINION OF THE COURT

1. DIVORCE — CHILD SUPPORT — APPEAL — PRESUMPTION OF VALIDITY.
   Review of child support provisions in judgments of divorce on appeal is made *de novo* by the Court of Appeals, however, the exercise of discretion in such matters by a trial court generally is presumed to be correct.

2. DIVORCE — CHILD SUPPORT — APPEAL — ABUSE OF DISCRETION.
   The party challenging an order of child support on appeal bears the burden of showing an abuse of discretion by the trial court, however, such abuse may be established more readily than in cases historically heard at law, and where the Court of Appeals is convinced that it would have reached a different result if it were in the position of the trial court it will reverse or modify the award.

3. DIVORCE — CHILD SUPPORT — ABILITY TO PAY — ABILITY TO EARN.
   One of the factors to be considered in determining the amount of an award of child support is a parent's ability to pay, and a court is not limited to consideration of the parent's actual income but also may look to the parent's unexercised ability to earn.

4. DIVORCE — CHILD SUPPORT — MODIFICATION OF CHILD SUPPORT — VOLUNTARY REDUCTION OF INCOME.
   A voluntary reduction of income by a parent required to pay child support is not an adequate reason for a court to refuse to modify an order of support absent bad faith or willful disregard for the interests of the dependent child.

5. DIVORCE — CHILD SUPPORT — INCOME EARNING CAPACITY OF PARENTS.
   The fact that a parent is voluntarily earning less than is possible is not an adequate reason for a court initially to award child support in an amount higher than the parent's actual income would dictate.

CONCURRENCE BY J. T. KALLMAN, J.

6. DIVORCE — CHILD SUPPORT — AWARDS OF CHILD SUPPORT — CONSTITUTIONAL LAW.
   *An order by a trial court in an action for divorce requiring a parent to pay child support in an amount not commensurate*

*with his actual earnings is violative of the constitutional guar-
antees of freedom of religion where the parent is a member of a
religious order, the order is his employer, his actual earnings
are less than it would be possible to earn in a secular vocation,
and payment of the amount ordered would necessitate his
renouncing his religious vocation to accept secular employment
(US Const, Am I, Const 1963, art 1, § 4).*

*Quinn E. Benson, P.C.,* for plaintiff.

*Charles E. Martell,* for defendant.

Before: R. B. BURNS, P.J., and R. M. MAHER and
J. T. KALLMAN,* JJ.

PER CURIAM. Plaintiff appeals by right the order
of the trial court modifying a previous divorce
judgment and providing in part that he pay a total
of $27 per week for the support of his two minor
children.

Plaintiff and defendant were married in 1965
while plaintiff was attending a seminary in prepa-
ration for ordination in the United Methodist
Church. During their marriage, one child was born
to the parties, and they adopted another. During
the summers of 1968, 1969, and 1971, the parties
were involved with the Ecumenical Institute and a
related religious order, the Order Ecumenical. It
was during this period that plaintiff became inter-
ested in pursuing his ministry through full-time
involvement with the order. After leaving the
seminary, plaintiff was assigned to a church in
Comstock, Michigan, and was ordained a minister
in the United Methodist Church.

In May of 1974, the parties were divorced. Plain-
tiff was granted custody of the two minor children
and no support order was entered against defen-
dant. In September of 1974, plaintiff joined the

* Circuit judge, sitting on the Court of Appeals by assignment.

Order Ecumenical. He is currently assigned to the order by the bishop of the West Michigan Conference of the United Methodist Church. Pursuant to his work with the order, plaintiff was assigned to various places in the United States. The parties' two children accompanied him on these assignments until 1977 when plaintiff voluntarily relinquished custody of the parties' oldest child to defendant. Plaintiff has recently relinquished custody of the youngest child as well, as a result of his pending assignment to Calcutta, India.

At the hearing, the parties testified as to their relative financial positions. As a member of the Order Ecumenical, plaintiff has taken vows of poverty and obedience. Members of the order are given a place to live and a food allowance for their families and are paid a stipend roughly commensurate with the poverty level of the nation to which they are assigned. Plaintiff testified that while assigned to various locations in the United States with his two children this stipend amounted to approximately $84 per month. He further testified that when he took up his assignment in India the stipend would be closer to $12 per month. Assignments are made by the superiors of the order, and plaintiff testified that members are sometimes assigned to take secular employment. When so employed, members of the order continue to receive only their stipend, and all remaining net income is turned over to the order. Plaintiff testified that he had been assigned to such jobs by the order and that he had earned as much as $14,000 per year through such jobs. All of the net income plaintiff earned in these jobs was turned over to the order. The order provides medical, dental, and optical insurance for the families of its members, and plaintiff agreed to continue to carry such coverage

for his children. Defendant is employed by radio station WJR as a producer and at the time of the hearing earned a monthly take-home pay of $916. Defendant also testified that she had recently purchased a home in Grosse Pointe Woods, Michigan, for $38,900.

At the close of the hearing, the trial court held that plaintiff's actions constituted a willful disregard for the interest of his children and ordered, *inter alia,* that he pay $27 per week in child support until the oldest child reached the age of 18 and $19 per week thereafter until the youngest child reached the age of 18.

On appeal, plaintiff claims that the trial court erred in determining the amount of child support ordered. Although our review of child support matters is traditionally *de novo,* we do not exercise that review in a vacuum. Much discretion is vested in the trial court, and the exercise of that discretion generally is presumed to be correct. *Hakken v Hakken,* 100 Mich App 460, 464; 298 NW2d 907 (1980), *Causley v LaFreniere,* 78 Mich App 250, 254-255, fn 2; 259 NW2d 445 (1977). The party appealing from the child support order bears the burden of showing a clear abuse of discretion. *Hakken, supra.* Because of the historically equitable nature of child support proceedings, however, such an abuse may be established more readily than in cases historically heard at law, and we will reverse or modify the award if convinced that we would have reached a different result if in the position of the trial court. *Hakken, supra, Vaclav v Vaclav,* 96 Mich App 584, 589; 293 NW2d 613 (1980), *Causley, supra.*

With these principles in mind, we note first that one of the factors to be considered in determining the amount of child support is the parent's ability

to pay. The court is not, however, limited to consideration of the parent's *actual* income and may also look to the parent's unexercised ability to earn. *Vaclav, supra,* 588, *Heilman v Heilman,* 95 Mich App 728, 733; 291 NW2d 183 (1980), *lv den* 409 Mich 893 (1980), *Travis v Travis,* 19 Mich App 128, 130; 172 NW2d 491 (1969). The trial court's award of child support in the instant case was based largely on the fact that plaintiff had demonstrated in the past an ability to earn much more than the amount of his stipend from the order.

Recent decisions concerning modification of existing child support orders make it clear, however, that there are factors which limit a court's reliance on a parent's unexercised ability to earn. In *Moncada v Moncada,* 81 Mich App 26, 31; 264 NW2d 104 (1978), this Court held that "absent bad faith or willful disregard for the interests of the dependent children, a voluntary reduction of income is not an adequate reason for refusing modification of a support order". See *Hakken, supra,* 464, *Rutledge v Rutledge,* 96 Mich App 621, 625; 293 NW2d 651 (1980).[1] If a voluntary reduction in income made in good faith and without an intent to jeopardize the welfare of dependent children can justify a reduction in child support payments despite necessarily strong proof of unexercised ability to earn, the same rule should apply to cases such as that now before us where the issue of child support is being considered for the first time. Accordingly, absent bad faith or willful disregard

[1] In *Gerlach v Gerlach,* 82 Mich App 605; 267 NW2d 149 (1978), this Court affirmed the trial court's refusal to modify an award of alimony. The modification was sought on the basis of an apparently voluntary reduction in income. This Court's one-page decision did not directly address the issue of whether the reduction in income was made in bad faith, but the fact that the Court cited *Moncada* while finding no abuse of discretion under the circumstances presented suggests that the court implicitly found a lack of good faith.

for the interests of the dependent children, the fact that a parent is voluntarily earning less than is possible is not an adequate reason for ordering child support at a rate much higher than the parent's actual income would dictate.

In the instant case, the record clearly establishes plaintiff's good faith and the lack of willful disregard for the interests of his children. Plaintiff's interest in and association with the Order Ecumenical began long before his divorce from defendant and there is no hint in the record before us that plaintiff became involved in the order merely to avoid his obligations to his children. The order makes provisions for the care of the children of its members, and it is undisputed that plaintiff and the order adequately provided for his children while he retained custody. Plaintiff has voluntarily agreed to continue medical, dental, and optical insurance coverage on his children through the order and has agreed to pay child support commensurate with his actual income. Keeping in mind the appropriate standards of review discussed earlier, we believe that the trial court has committed a clear abuse of discretion. Child support should be ordered on the basis of plaintiff's actual income, and this cause is accordingly remanded for a redetermination of the child support award. While plaintiff's actual income is made up of both his stipend and the reasonable value of the room and board which he receives, the award should reflect plaintiff's ability to pay.

Given our disposition of this case, there is no need to address the other issues raised by plaintiff on appeal.

Reversed and remanded.

J. T. KALLMAN, J. *(concurring).* While at first

blush this would appear to be simply a matter of whether or not a father should pay child support, it is not. Because of the most unusual facts, this case is in reality a First Amendment issue. The issue is simply: May this Court order a man to get a job and pay child support which will force him to leave his religious order and renounce his religious vows? The lower court said yes; I disagree. I would reverse the lower court and order the case remanded to the trial court to determine the amount of child support.

The plaintiff and the defendant were married in 1965 while plaintiff was in a seminary. Both were involved with the Order Ecumenical during the summers of 1968, 1969, and 1971. Plaintiff served as pastor of a church in 1970 and was ordained an elder in 1972. In 1973, he was pastor of the Comstock Methodist Church. The parties were divorced on May 28, 1974, one of the reasons being plaintiff's decision to join the Order Ecumenical. No support order was entered against either party. The plaintiff joined the Ecumenical Institute, or Order Ecumenical, in September, 1974, as an intern. Plaintiff was awarded custody of both minor children in the original judgment of divorce.

Subsequent to the divorce, plaintiff, after being assigned to the Order Ecumenical, lived with the children in Chicago, Illinois, Dallas, Texas, and Phoenix, Arizona. During this period, both children lived with the father without receiving any support from the mother. While living in Phoenix in 1977, the plaintiff voluntarily allowed his son to move to Detroit to live with his mother. Thus, for three years plaintiff had to furnish all the love, care, and support for the two children. Thereafter, plaintiff lived in Pittsburgh, Pennsylvania, and New York. All moves were at the direction of his superiors.

In 1979, plaintiff was assigned to Calcutta, India, and custody of the minor daughter was voluntarily placed with the mother by the father. So for five to six years, plaintiff has had to furnish all the love, care, and support for the minor daughter. Does this sound like a father who is dodging his responsibilities? I would say not.

The mother, who paid no support for up to six years, seeks support from her ex-husband now that she must provide all the love, care, and support for the two children.

The mother is employed, receiving a take-home pay of $916 per month. The father will receive a stipend of $12 per month while living in Calcutta, India. The lower court has substituted its religious judgment in the guise of determining the father's responsibility to care for his children, thus ordering the father indirectly to leave his chosen field, that of legitimate and established religious service. The contra argument is that, while in the religious order, he, at the direction of the order, was employed at a secular job, thereby establishing that he was able to earn up to $14,000 a year, and that he can do so again. The record also reveals that those monies earned were all turned over to the Order Ecumenical. The judicial reasoning is that because he can earn money he should get a secular job and pay his child support or be held in contempt.

Immediately, the plaintiff is placed between a rock and a hard place: either he must disobey his religious order, or he must disobey the court. If he violates his religious vows and the orders of his superiors, he will probably be censured and removed from the order; if he violates the court's order, he goes to jail for up to one year. Clearly, either choice is detrimental to the plaintiff. The

court's order clearly infringes on a person's freedom of choice to follow the dictates of his conscience in serving God. There is nothing more precious or sacred than protecting our citizens from the dictates of governmental orders, including those of the courts, which infringe on their right of religious freedom, as stated in our First Amendment.

The United States Constitution, Am I, provides in pertinent part: "Congress *shall make no law* respecting an establishment of religion, or *prohibiting the free exercise thereof * * *."* (Emphasis added.)

The Michigan Constitution, 1963, art 1, § 4, provides in pertinent part:

"Every person shall be at liberty to worship God according to the dictates of his own conscience. * * * the *civil* and political *rights, privileges and capacities of no person shall be diminished or enlarged on account of his religious belief."* (Emphasis added.)

A parent has a statutory duty to support his child. MCL 722.3; MSA 25.244(3). After an initial determination of the duty to support following a divorce, under MCL 552.23; MSA 25.103, modification of a support order is possible.

"After a judgment for alimony or other allowance, for either party and children, or any of them, and also after a judgment for the appointment of trustees, to receive and hold any property for the use of either party or children as before provided the court may, from time to time, on the petition of either of the parties, revise and alter such judgment, respecting the amount of such alimony or allowance and the payment thereof, and also respecting the appropriation and payment of the principal and income of the property so held in trust, and may make any judgment respecting

any of the matters which such court might have made in the original suit." MCL 552.28; MSA 25.106.

The last part of the Michigan constitutional provision is especially significant: "The civil * * * rights * * * and capacities of no person *shall be diminished* * * * on account of *his religious belief.*" (Emphasis added.) In this case the circuit judge diminished the plaintiff's civil right to serve his God through the religious Order Ecumenical by ordering him to work in a secular job to pay child support. Const 1963, art 1, § 4, states: "Every person shall be at liberty to worship God according to the dictates of his own conscience."

The decision in this case clearly nullified this constitutional provision for David Dunn. He has lost his liberty (the court ordered him to get a secular job) and his conscience (the court has substituted its conscience for his). To permit this decision to stand makes a mockery out of the religious freedom clauses.

This Court has struggled with a man's right to serve God versus a father's obligation to raise his children. A man should be able to do both. A man should do both. A man who does not support his children violates Michigan law, *Ebel v Brown,* 70 Mich App 705, 709; 246 NW2d 379 (1976), and God's law. What then? Does God rule that men must violate this law to fulfill one of His other laws? Forbid! The two Biblical laws: (1) to serve God, and (2) to care for his children, are in complete harmony for the second is accomplished in the first. The vows of obedience and poverty are a religious organization's determination and not God's. God does not require such oaths to serve Him. If a man or woman in his heart and conscience feels that this is God's will for his life, St. Paul admonishes that he should remain single as

this would be best for his life. Unfortunately, we cannot manufacture the facts. The facts are generally set in concrete, as they are here, before we get them. It is the facts that are generally difficult to apply to the law. Such is the case here.

I note with *emphasis* that this record shows clearly no pretext, bad faith, or fraud by this plaintiff to avoid child support payments. Those facts are critical and pivotal in deciding this case. *Wisconsin v Yoder,* 406 US 205; 92 S Ct 1526; 32 L Ed 2d 15 (1972). The plaintiff here, when ordered to pay child support, did not quit his job or refuse to work or join a religious order, in contrast with the defendant in *Pencovic v Pencovic,* 45 Cal 2d 97; 287 P2d 501 (1955). There is no bad faith or willful disregard of his obligations on this record. Plaintiff had been serving his God for over five years as a member of Order Ecumenical. For any court to arbitrarily disregard this, plus the many years the plaintiff alone cared for the children without any help from the defendant, clearly is an abuse of discretion as well as a violation of the plaintiff's religious freedom.

No statute, not even Michigan's, nor the common law can take precedence over a guaranteed constitutional right, *i.e.,* the free exercise of one's religion. In this case, the plaintiff has clearly and beyond a reasonable doubt shown that his religious vows and beliefs are sincerely held and that such vows and beliefs were not developed suddenly to avoid child support payments. The case of *McKeever v McKeever,* 36 Or App 19; 583 P2d 30 (1978), ordered the husband to pay child support, and thereafter he resigned from remunerative employment to take on a nonpaying promotional position with an evangelical order. Such is not the case here. Plaintiff is clearly in accord with both

the constitution, the statutes, and common law of this state. He has done no wrong. He is following his conscience as permitted by our constitution. While his conscience may not be in accord with the trial judge's, this does not deprive him of his constitutional safeguards.

If we were to construe the statutory and common law as requiring plaintiff to abandon his religious vocation to support his children, that reading would clash with art 1, § 4, of the Michigan Constitution. We observe, however, that whenever possible the courts must construe the law so as to render it constitutional. *Osborn v Charlevoix Circuit Judge,* 114 Mich 655, 660; 72 NW 982 (1897). I would therefore find that the statutory law imposes no obligation on plaintiff to abandon his vocation to support his children, who may be adequately cared for by the mother.

The positions of law and the legal principles enunciated by both sides in this case are correct. However, that law as applied to the facts in this case is what causes great difficulty. In fact, one can logically accept the applications of the law to the facts by both sides. It is here where this Court must begin to apply legal maxims to the law and facts in striving to apply which law governs. Principles of construction necessitate that one read the provisions involved, and, if one can draw a logical understanding from the four corners of the provisions, that governs. The ordinary, common understanding of words shall also govern. As one struggles with these and other principles inherent in the law, a titanic struggle of the mind begins. One must apply these principles so that where statutes conflict with our constitution (people's rights), the latter controls.

In this case, one is tempted to say that the

religious order, instead of plaintiff's children, benefits from the plaintiff's commitment so it should pay the $27 weekly sum for the plaintiff. But under our laws, and in this case, this cannot be done; the order is not a party to this suit and therefore is not bound by an order of this Court. Nevertheless, one wonders why support is not part of the religious commitment with the Order Ecumenical when it benefits so greatly from plaintiff's commitment and zeal.

I concur that the case should be reversed and remanded.