Cite as 2022 Ark. App. 514

# ARKANSAS COURT OF APPEALS

DIVISION IV
No. CV-21-550

| | | |
|---|---|---|
| MARY SMITH | | Opinion Delivered December 14, 2022 |
| | APPELLANT | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, FIFTEENTH DIVISION |
| V. | | [NO. 60DR-19-4098] |
| | | HONORABLE AMY DUNN JOHNSON, JUDGE |
| JONATHAN SMITH | | |
| | APPELLEE | REVERSED AND REMANDED |

**KENNETH S. HIXSON, Judge**

Appellant Mary Smith and appellee Jonathan Smith were divorced by a decree entered on June 22, 2021. The trial court ruled that the parties will share joint legal and physical custody of their two children, MC1, born in 2009, and MC2, born in 2012. The trial court ordered Jonathan to pay $1196.23 in monthly child support and denied Mary's request for alimony. The trial court also divided the parties' marital property, purporting to divide it equally.

Mary now appeals from the divorce decree. Mary challenges the award of child support, arguing that the trial court erred in imputing income to her for purposes of setting the child support and that the trial court erred in using a methodology inconsistent with the provisions of Administrative Order No. 10. Mary also contends that the trial court erred in

imputing income to her for purposes of alimony and in denying her alimony request. Finally, Mary argues that the trial court erred in making an unequal division of the parties' bank accounts. We reverse and remand on each of these issues, as explained herein.

I. *Standard of Review*

Our standard of review in domestic-relations cases is well settled. This court reviews domestic-relations cases de novo, but we will not reverse the trial court's findings unless they are clearly erroneous. *Doss v. Doss*, 2018 Ark. App. 487, 561 S.W.3d 348. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. *Id.* Due deference is given to the trial court's superior position to determine the credibility of witnesses and the weight to be given their testimony. *Id.* As to issues of law, however, we give no deference to the trial court; rather, we review issues of law de novo. *Hargrove v. Hargrove*, 2015 Ark. App. 45, 453 S.W.3d 683.

II. *Facts and Procedural History*

Mary and Jonathan were married on May 25, 2002. The parties separated in October 2019, after which Mary remained in the marital home and Jonathan moved to a nearby apartment. On October 28, 2019, Mary filed a complaint for divorce, and on the following day Jonathan filed an answer and a counterclaim for divorce. On June 9, 2020, the parties entered into an agreed temporary order whereby they agreed to share joint legal and physical custody of the children, with their time with the children being divided equally in a week on/week off fashion. The final divorce hearing was held on May 19, 2021.

2

Mary is a school teacher. Mary testified that after the parties married, she taught for five years at a public school. After MC1 was born, the parties agreed that Mary would be a stay-at-home mother, and Mary stayed at home to raise MC1 and MC2 for the next seven years. When MC1 reached school age, the parties agreed that he would be enrolled at Baptist Preparatory School (Baptist Prep). Baptist Prep is a private school, and Mary explained that this decision was based on Jonathan's rich family history with the school. Jonathan and his siblings had all graduated with honors from Baptist Prep. When MC2 reached school age, he, too, was also enrolled at Baptist Prep.

By agreement of the parties, Mary began teaching at Baptist Prep when MC2 was enrolled in August 2016. Mary has taught there ever since, and she earns an annual salary of $28,680. Mary stated that because she is employed as a teacher at Baptist Prep, the children receive a discount on their tuition.[1] Mary testified that after the parties' separation, Jonathan changed his mind about the children being enrolled at Baptist Prep and thought they should go to a public school to save money. Jonathan told Mary that he did not object to the children remaining at Baptist Prep as long as Mary paid for it, and since that time, Mary (with the assistance of her parents) has paid the children's tuition. Mary stated that Baptist Prep provides an excellent education as well as an educational-therapy program and that both children are performing well.

---

[1]Mary stated the total discount for the two children is about $8000 a year, leaving an annual total cost of about $15,000 for both children.

Mary acknowledged in her testimony that if she worked in the public-school system, she could earn approximately double what she earns at Baptist Prep. Mary stated that, since the parties' separation, Jonathan has told her "in a very insulting manner" that she was underemployed and that she needed to make more money somewhere else. Mary, however, stated that she preferred to remain at Baptist Prep where the children are enrolled and that she would continue to teach there. Mary stated that in addition to the tuition discount, there are other advantages to teaching at the school where the children are enrolled. Mary stated that she is available for the children at school when they have issues, including coping with the divorce, and that she is able to coordinate their therapy and counseling at the school. Mary also stated that she brings the children home from school with her even during the weeks when Jonathan has custody. On those weeks, the children stay at Mary's house after school doing homework or other activities until Jonathan gets off work and comes to pick them up.

Mary also testified that she was seeking alimony from Jonathan and stated that she thought $2500 a month for a period of five years would be appropriate. Mary stated that alimony would assist her with pursuing a two-year online program to earn a master's degree, which would increase her income potential.

Jonathan is employed at Vestcom International where he has worked for fourteen years, and at the time of the divorce hearing, he earned an annual salary of $170,168. Jonathan testified that although he and Mary mutually agreed during their marriage that the children would attend Baptist Prep, he thought that the children should now be placed in a

public school.  Jonathan stated further that Mary is capable of working as a public-school teacher earning substantially more money than she earns at Baptist Prep.  He thought that, for purposes of the child-support and alimony issues, Mary's annual income should be imputed at $50,000.  Jonathan testified that Mary needed to "reduce her dependence on [him] and provide for what she needs for her children."  Jonathan asked that, if any alimony was awarded, it be limited in duration and amount.

On June 22, 2021, the trial court entered a divorce decree.  In the decree, the trial court ordered that the parties share joint legal and physical custody of the children, with their time with the children being divided equally in a week on/week off fashion.  The trial court denied Mary's request for alimony, and found:

> [Mary's] request for spousal support is denied.  The Court weighed the ability and need of each Party and other factors and finds that [Mary] did not establish a need sufficient to warrant an award of spousal support due to her ability to obtain employment at twice her private school income and other resources.  Her testimony was that she would double her income based on her current education and experience by teaching in public schools, but she has chosen employment at the private school the parties' children attend.  The Court imputes a gross salary of $50,000.00 a year or $4,166.67 a month to [Mary].

With respect to child support, the trial court also imputed income of $50,000 a year—or $4166.67 a month—to Mary, and the trial court found that Jonathan's monthly income was $14,314.  As will be more fully explained below in our analysis of the child-support issues, the trial court purported to apply Administrative Order No. 10 but then used the shared parenting worksheet from the South Carolina Department of Social Services to arrive at Jonathan's monthly child-support obligation of $1196.23.  The trial court awarded the

marital residence to Mary, subject to her responsibility for the debt and her payment of one-half the value of the equity to Jonathan. The trial court evenly divided the parties' respective retirement accounts. Finally, the trial court awarded any checking or savings accounts in either party's individual name as that party's separate property because the parties' joint accounts had been closed and divided in May 2020.

## III. *Analysis*

In this appeal from the divorce decree, Mary argues that the trial court erred in arriving at its child-support award, erred in its decision to deny her alimony, and erred in dividing the parties' property. We review each argument in turn.

## A. Child Support

Our standard of review for an appeal from a child-support order is de novo on the record, and we will not reverse a finding of fact by the trial court unless it is clearly erroneous. *David v. David*, 2022 Ark. App. 177, 643 S.W.3d 863. In reviewing a trial court's findings, we give due deference to that court's superior position to determine the credibility of the witnesses and the weight to be given to their testimony. *Id.* In a child-support determination, the amount of child support lies within the sound discretion of the trial court, and that court's findings will not be reversed absent an abuse of discretion. *Taylor v. Taylor*, 369 Ark. 31, 250 S.W.3d 232 (2007). However, a trial court's conclusions of law are given no deference on appeal. *Id.*

Before addressing Mary's specific arguments as they relate to child support, we observe that the trial court decided this case under the "Income Shares Model" adopted by the

6

supreme court in *In re Implementation of Revised Administrative Order No. 10*, 2020 Ark. 131, which became effective on June 30, 2020.[2] Administrative Order No. 10 takes into account the incomes of *both parties* instead of basing child support solely on the payor's income, as in the prior version of the rule. Section I of Administrative Order No. 10 states that the Income Shares Model is based on the concept that children should receive the same proportion of parental income that they would have received had the parents lived together and shared financial resources. Section I provides further that under the revised "Family Support Chart," each parent's share is that parent's prorated share of the two parents' combined income, subject to certain deviations or adjustments as will be explained further.

Mary first argues that the trial court erred in imputing income to her for calculation of child support. Although Mary earns only $28,680 as a teacher at the children's private school, the trial court imputed income of $50,000 based on her admission that she could significantly increase her income by teaching in public schools. Administrative Order No. 10, section III, paragraph 8, addresses "Income Imputation Considerations" and provides in pertinent part:

> If imputation of income is ordered, the court must take into consideration *the specific circumstances of both parents*, to the extent known, including such factors as the parents' assets, residence, employment and earnings history, job skills, educational attainment, literacy, age, health, criminal record and other employment barriers, and record of seeking work, as well as the local job market, the availability of employers

[2]Administrative Order No. 10 was again revised on October 6, 2022. However, the version of Administrative Order No. 10 applicable in this case is the version set forth in *In re Implementation of Revised Administrative Order No. 10*, *supra*, which we will refer to herein simply as "Administrative Order No. 10."

7

willing to hire the parent, prevailing earnings level in the local community, *and other relevant background factors in the case.*

There is a rebuttable presumption that the payor and the payee can work full-time or earn full-time income, and the court may calculate child support based on a determination of potential income that would otherwise ordinarily be available to the parties.

(Emphasis added.)

Mary argues that although Administrative Order No. 10, section III, paragraph 8, allows a court to *consider* imputing income, the provision uses the term "may"; therefore, this is a discretionary matter. Under the facts of this case, Mary contends that the trial court abused its discretion in imputing income to her. We agree.

In *Grady v. Grady*, 295 Ark. 94, 747 S.W.2d 77 (1988), the supreme court stated that there are circumstances under which it is appropriate to order child support based on a party's earning *capacity* rather than on actual earnings. The *Grady* court wrote:

> We have not dealt with this issue directly, but elsewhere it has been held that *the court may consider the fact that a supporting spouse voluntarily changes employment so as to lessen earning capacity* and, in turn, the ability to pay alimony and child support. *Camp v. Camp*, 269 S.C. 173, 236 S.E.2d 814 (1977). A court may in proper circumstances impute an income to a spouse according to what could be earned by the use of his or her best efforts to gain employment suitable to his or her capabilities. *Klinge v. Klinge*, 554 S.W.2d 474 (Mo. [Ct. App.] 1977).

> Determining the proper circumstances is sometimes difficult.

> On the one hand, *the courts must not unduly interfere with the personal lives and career choices of individuals merely because they have been involved in a divorce.* On the other hand, because there has been a divorce, the courts are thrust into the middle of the parties' personal lives in order to protect the interests of the minor children who are also unwilling participants in the divorce.

> *Rohloff v. Rohloff*, 161 Mich. App. 766, 411 N.W.2d 484 (1987).

8

*Grady*, 295 Ark. at 97–98, 747 S.W.2d at 78–79 (emphasis added). In *Grady*, the supreme court recognized that there are situations in which an income reduction is reasonable and justifiable under particular circumstances

The evidence presented established that Mary did not voluntarily change employment so as to lessen her earning capacity for purposes of supporting her children. The decision that Mary would teach at Baptist Prep—where the children attend school—was a mutual decision reached by the parties more than three years before their separation and the institution of the divorce proceedings. In her testimony, Mary explained that consistent with the parties' mutual agreement, her teaching at Baptist Prep benefits the children in various ways. Mary is available for the children when they have issues at school, she is able to coordinate their therapy and counseling at the school, and she brings the children home from school even on the weeks when Jonathan has custody of them. Moreover, by Mary teaching at Baptist Prep the children receive a substantial discount on their tuition. Mary testified that, although she could earn more money teaching in public schools, she has made the choice to remain at Baptist Prep where she had been teaching for almost five years as of the date of the divorce hearing.

In *Grady*, *supra*, the supreme court stated that "courts must not unduly interfere with the personal lives and career choices of individuals merely because they have been in involved in a divorce." *Grady*, 295 Ark. at 98, 747 S.W.2d at 79 (citing *Rohloff*, 161 Mich. App. 766, 411 N.W.2d 484). By imputing income to Mary, that is precisely what the trial court did in

this case. Mary suggests that if personal career choices like hers result in an imputation of income for child-support purposes, this will open the flood gates such that income can be imputed to anyone who is fully employed but does not attempt to earn the maximum in his or her occupation by seeking out different employers or locations where the person could potentially earn more income. As examples, Mary states that income could be imputed to an attorney or an accountant working for a federal or state agency because he or she could earn more in private practice. We find Mary's argument persuasive.

In light of the evidence presented, we hold that the trial court abused its discretion in imputing income to Mary for purposes of calculating child support. Therefore, on remand, the trial court is directed to apply Mary's actual earnings in its calculation of child support.

Also under this point, Mary argues that in addition to wrongfully imputing income to her, the trial court compounded the problem by not following the provisions of Administrative Order No. 10 and using an unauthorized methodology in arriving at child support. We agree with this argument as well.

Administrative Order No. 10 provides the framework for calculating child support under the Income Shares Model. Section I of Administrative Order No. 10 provides that each parent's share is that parent's prorated share of the two parents' combined income. Section I further provides that the pro rata charted amount establishes the base level of child support the payor parent must pay the payee parent. Pursuant to section II, a rebuttable presumption exists that the chart-derived amount is the amount to be awarded.

Section V, paragraph 1, sets out the relevant procedure:

[T]he gross income of both parents shall first be determined and combined. Each parent's share of the combined total gross income is then determined based on their percentage of the combined income. Next, the basic child-support obligation is determined by looking at the Chart for the parties' combined income and the number of children they have. A presumptive child-support obligation is then determined by adding the allowed additional monthly child-rearing expenses (including health insurance premiums, extraordinary medical expenses, and childcare expenses). Each parent's share of additional child-rearing expenses is determined by multiplying the percentage of income they have available for support, which was determined in step 1. The total child-support obligation for each parent is determined by adding each parent's share of child-support obligation with their share of allowed additional child-rearing expenses. Lastly, the payor receives a credit for the additional child-rearing expenses that the payor is paying out of pocket, resulting in their presumed child-support order.

Further, section II, paragraph 2, provides guidelines for the trial court to follow when deciding whether to deviate from the guidelines. In making a deviation, the court must explain its reasons in writing and should consider the following factors:

a. Educational expenses for the child(ren) (i.e., those incurred for private or parochial schools, or other schools where there are tuition or related costs) and/or the provision or payment of special education needs or expenses for the child(ren);

b. The procurement and/or maintenance of life insurance, dental insurance, and/or other insurance for the children's benefit (for health insurance premiums, see Section II.2 infra);

c. Extraordinary travel expenses for court-ordered visitation;

d. Significant available income of the child(ren);

e. The creation or maintenance of a trust fund for the children;

f. The support given by a parent for minor children in the absence of a court order;

g. Extraordinary time spent with the payor parent;

11

h. Additional expenses incurred because of natural or adopted children living in the home, including stepchildren if the court finds there is a court-ordered responsibility to a stepchild;

i. The provision for payment of work-related childcare, extraordinary medical expenses for the child in excess of $250.00 per year per child, and/or health insurance premiums. Ordinarily these expenses will be divided pro rata between the parents and added to the base child support of the payor parent on the Worksheet. In that scenario, it shall not support a deviation. However, if the court chooses not to add them in the total child-support obligation, they could support a deviation; and

j. Any other factors that warrant a deviation.

Administrative Order No. 10, section II, paragraph 2.

While section II, paragraph 2, can be somewhat consistently applied to the traditional primary custodian (payee) and visitation (payor) relationships, the section II, paragraph 2 provisions are incomplete when the parties participate in true joint custody. To that end, Administrative Order No. 10, section V, paragraph 2 was created to provide the trial court with the flexibility to modify or adjust basic child support based on, inter alia, the number of "overnights" that a child resides in a party's household, disparity of income of the parties, and the amount of routine costs that a parent may spend on a child. In such cases, the following guidance is provided:

In cases of joint or shared custody, where both parents have responsibility of the child(ren) for at least 141 overnights per calendar year, the parties shall complete the Worksheet and Affidavit of Financial Means as they would in any other support case. The court may then consider the time spent by the child(ren) with the payor parent as a basis for adjusting the child-support amount from the amount determined on the Worksheet. In particular, in deciding whether to apply an additional credit, the court should consider the presence and amount of disparity between the income of the parties, giving more weight to those disparities in the parties' income of less than 20% and considering which parent is responsible for the majority of the non-duplicated

12

fixed expenditures, such as routine clothing costs, costs for extracurricular activities, school supplies, and any other similar non-duplicated fixed expenditures.

Administrative Order No 10, section V, paragraph 2.

The trial court determined that Mary is capable of earning a gross income of $4166.67 a month[3] and that Jonathan earns a gross income of $14,314 a month. Therefore, according to these figures, the parties' combined gross income is $18,480.67, which results in a combined basic child-support obligation of $2113 for their two children pursuant to the family support chart. The trial court found that Mary is responsible for 22.5 percent of the total obligation and that Jonathan is responsible for 77.5 percent of the total obligation.

The trial court found that "[b]ased on the equal time division of the parties with the children and other factors pursuant to Administrative Order No. 10, the court finds that a deviation is appropriate." However, in arriving at this stated "deviation," the trial court mechanically applied its figures to the shared parenting worksheet from the South Carolina Department of Social Services. We hold that this was error.

Pursuant to the provisions in the South Carolina worksheet, the trial court multiplied the parties' basic combined child-support obligation by 1.5, thus increasing the basic combined obligation from $2113 to $3169.50. While using this "multiplier" may be the correct formula in South Carolina, it is not the correct formula in Arkansas's Administrative Order No. 10, section V. The use of this South Carolina multiplier throws off every

---

[3]As previously stated, the trial court erred in imputing this income to Mary. However, as will be explained, even had these figures been accurate, the trial court's methodology in setting child support was erroneous.

subsequent calculation made by the trial court. The trial court found that Mary's share of this obligation is $714.60 and that Jonathan's share is $2454.90. Using various formulas provided for in the South Carolina worksheet that account for a joint-custody arrangement and equal time with the children, the trial court then found that Mary's basic child-support obligation is $357.30 and that Jonathan's basic child-support obligation is $1227.45, resulting in Jonathan having a net child-support obligation of $870.15. Then, noting that Mary pays $421 in monthly health-insurance premiums for the children, the trial court increased Jonathan's child support by 77.5 percent of this amount, resulting in Jonathan's final child-support obligation of $1196.23.

We conclude that the trial court erred when it deviated from the chart amount by utilizing a method from South Carolina. Use of the formulas prescribed by the South Carolina worksheet is not authorized by Administrative Order No. 10, and in particular, there is no provision in Administrative Order No. 10 that allows for multiplying the shared basic child-support obligation by a factor of 1.5. A deviation or adjustment, if ordered, must be consistent with the considerations set forth in section II, paragraph 2 of Administrative Order No. 10, which sets forth the deviation factors; and section V, paragraph 2, which addresses joint- or shared-custody arrangements. On remand, the trial court must comply with the requirements set forth in Administrative Order No. 10 to determine the child-support amount.

14

## B. Alimony

The purpose of alimony is to rectify the economic imbalances in earning power and standard of living in light of the particular facts in each case. *Richards v. Richards*, 2022 Ark. App. 309, 651 S.W.3d 190. The primary factors to be considered in determining whether to award alimony are the financial need of one spouse and the other spouse's ability to pay. *Kuchmas v. Kuchmas*, 368 Ark. 43, 243 S.W.3d 270 (2006). The trial court may also consider other factors, including the couple's past standard of living, the earning capacity of each spouse, the resources and assets of each party, and the duration of the marriage. *Page v. Page*, 2010 Ark. App. 188, 373 S.W.3d 408. The decision to grant alimony lies within the sound discretion of the trial court and will not be reversed on appeal absent an abuse of discretion. *Dozier v. Dozier*, 2014 Ark. App. 78, 432 S.W.3d 82. A trial court abuses its discretion when it exercises its discretion improvidently or thoughtlessly and without due consideration. *Id.*

The trial court denied Mary's request for alimony, and Mary argues that its decision was erroneous. Mary asserts that there is a significant disparity in the parties' incomes, being that she makes only $28,680 a year compared to Jonathan's annual salary of $170,168. Mary contends that the trial court abused its discretion in imputing a $50,000 annual salary to her in arriving at the decision to deny alimony.

We agree with Mary's argument that the trial court abused its discretion in imputing income to her for purposes of alimony for the same reasons the trial court abused its discretion in imputing income to her for purposes of child support, as we discussed and explained, *supra*. Mary's career choice to teach at Baptist Prep rather than seek higher-

15

earning employment in the public schools was merely a continuation of the parties' mutual agreement reached several years prior to the divorce that Mary would teach at the children's school to the benefit of the children. On remand, we instruct the trial court to not impute income to Mary and to reconsider the alimony issue based on Mary's actual salary.

## C. Division of Property

Finally, Mary argues that the trial court erred in its division of the parties' marital property. Specifically, Mary contends that the trial court divided the parties' bank accounts unequally. In the divorce decree, the trial court awarded Mary and Jonathan the bank accounts held in their individual names, noting that the parties' joint bank accounts were closed and divided in May 2020. Mary states that between the parties' division of their bank accounts in May 2020 and the May 2021 divorce hearing, Jonathan earned substantially more income than her and that both their incomes earned during that time span constituted marital property. Mary notes that in the parties' affidavits of financial means, she reported having only $7905 in cash, while Jonathan reported having $16,946 in cash, and she asserts that these amounts should have been divided equally between the parties. Mary correctly asserts that property acquired during the marriage, even after separation, is marital property. *See Cavin v. Cavin*, 308 Ark. 109, 823 S.W.3d 843 (1992).

We have held that property division and alimony are complimentary devices that a trial court uses to make the dissolution of a marriage as equitable as possible. *Cole v. Cole*, 82 Ark. App. 47, 110 S.W.3d 310 (2003). Because we are reversing and remanding the

16

alimony issue for further consideration, we also instruct the trial court to revisit the issue of division of the parties' bank accounts on remand. *See id.*

## IV. *Conclusion*

In conclusion, we hold that the trial court abused its discretion in imputing income to Mary for purposes of calculating child support and also erred by setting the child support using a methodology inconsistent with the provisions of Administrative Order No. 10. We also hold that the trial court abused its discretion in imputing income to Mary for purposes of denying alimony, and we instruct the trial court on remand to reconsider its alimony decision based on Mary's annual salary without imputing income. Finally, because we are reversing and remanding the alimony issue for reconsideration, we instruct the trial court on remand to revisit the issue of division of the parties' bank accounts. We reverse and remand for entry of an order consistent with this opinion.

Reversed and remanded.

VIRDEN and BARRETT, JJ., agree.

*Barry E. Coplin*; and *Montgomery Wyatt Hardy, PLC*, by: *Betty J. Hardy*, for appellant.

*Dusti Standridge*, for appellee.